

# AFSCME ®

## American Federation of State, County and Municipal Employees, AFL-CIO

Gerald W. McEntee
*President*

William Lucy
*Secretary-Treasurer*

John Seferian
Chairperson
Judicial Panel

*Judicial Panel Members*

Rosetta Daylie
Chicago, IL

Joe Devlaeminck
Portland, OR

Robert Lyons
Madison, WI

Pete Matthews
Philadelphia, PA

Ralph Miller
Los Angeles, CA

Gloria Plowell
Nashua, NH

Roger Siegal
St. Paul, MN

Jim Tucciarelli
New York, NY

1625 L Street, N.W.
Washington, D.C. 20036-5687
E-mail: judicialpanel@afscme.org
Telephone: (202) 429-1210
Fax: (202) 822-8169

June 6, 2003

## JUDICIAL PANEL CASE NO. 02-121
### Local 646 Administratorship

GREETINGS:

Enclosed is the decision of the administratorship hearing board in the above-captioned matter.

In Solidarity,

John Seferian
Judicial Panel Chairperson

JS: ahd

cc:   Gerald W. McEntee, International President
      William Lucy, International Secretary-Treasurer
      Larry P. Weinberg, General Counsel
      Paul Booth, Asst. to the President
      Jim Schmitz, Director, O&FS
      Peter Trask, Administrator, Local 646
      Joseph Rodrigues, Oahu Div. Vice President
      Stephen Perreira, Kauai Div. Vice President
      Alison Leong, Private Sector Div. Vice President
      Rowena Tachibana, Kauai Div. Secretary
      Rita Takabayashi, Private Sector Div. Secretary
      Yvonne Gaspar, Maui Div. Treasurer
      Joanne Carvalho, Hawaii Div. Treasurer
      Harold Moniz, Maui Div. Vice President
      Craig Yugawa, Hawaii Div. Vice President
      Franklin Crozier, maui Div. Secretary
      Samuel Kalua III, Hawaii Div. Secretary

**EXHIBIT A**

JPC 02-121dec
Page 2

Ronald Yamanaka, Oahu Div. Treasurer
Ivan Nitta, Kauai Div. Treasurer
Kathryn Cabacungan, Private Sector Div.
Andrew Kauanoe, Oahu Div. Delegate
August Cambra, Oahu Div. Delegate
Craig Kauanoe, Oahu Div. Delegate
Lois Fukushima, Oahu Div. Delegate
Robert Mielke, Oahu Div. Delegate
Wayne Kruse, Oahu Div. Delegate
Victorino Polido, Maui Div. Delegate
Ann Taniyama, Oahu Div. Delegate
Avis Makalii, Oahu Div. Delegate
Jerry Katada, Oahu Div. Delegate
Margaret Nakamura, Oahu Div. Delegate
Steven DeCosta, Oahu Div. Delegate
Edwin Kaupu, Maui Div. Delegate
Allen Nobriga, Hawaii Div. Delegate
Miulan Kia, Hawaii Div. Delegate
Mona Hashimoto, Private Sector Div. Delegate

JUDICIAL PANEL CASE NO. 02-121
Local 646 Administratorship

On December 5, 2002, International President Gerald W. McEntee placed the United Public Workers, Local 646, AFSCME, AFL-CIO under administratorship pursuant to Article IX, Section 36 of the International Constitution.

Peter Trask was appointed to serve as the administrator of the local. The officers and executive board members of the local were notified of the International President's action and the matter was referred to the Judicial Panel for hearing pursuant to Article IX, Sections 38 and 39 of the International Constitution.

In imposing the administratorship, the International President stated:

> On November 19, 2002, Gary Rodrigues, who was then the State Director of United Public Workers, Local 646, AFSCME, AFL-CIO (UPW), was found guilty of 101 counts of embezzlement of the local's assets, acceptance of kick-backs, mail fraud, money laundering, money laundering conspiracy, and scheme to defraud a health care benefit program. On the basis of that verdict, I suspended Gary Rodrigues from his UPW office. Since then, I have learned that, after Mr. Rodrigues' suspension, the state executive board permitted him to continue to participate in the governance of UPW. That participation included, but was not limited to, the installation by the state executive board of a new state director on November 22, upon Mr. Rodrigues' recommendation, through a process in which Mr. Rodrigues took part. The irregular process through which this was accomplished included the board's purported suspension of UPW's president—the highest-ranking officer of the Union at the time—who otherwise would have had under UPW's constitution the sole authority to appoint a new state director, subject only to the executive board's approval of such appointment. The foregoing actions were taken through procedures that are contrary to the AFSCME and UPW constitutions, as well as to my November 21, 2002 suspension of Mr. Rodrigues; and those improper procedures violated the democratic rights of the members of UPW. These actions indicate that, notwithstanding his guilty verdict and his suspension, Mr. Rodrigues has continued to exert influence and/or control over the actions of the state executive board, and

that such influence and/or control may be ongoing. These actions also indicate that the state executive board does not grasp the seriousness of the fact that Mr. Rodrigues was found by a jury to have committed crimes involving assets of the local.

For the foregoing reasons, I believe that the current leadership of UPW is conducting the affairs of the union in a manner that jeopardizes the financial integrity of the local and violates the democratic rights of the members of UPW.

These concerns are heightened by the fact that, as I understand it, Mr. Rodrigues is demanding that UPW pay him some $700,000 in severance, vacation pay and other benefits to which he claims to be entitled. Given the recent events described in this letter, there is a danger that UPW's current leadership may pay Mr. Rodrigues some or all of the sums demanded, without regard to whether he properly is entitled to payment, and notwithstanding the crimes he has committed against the Union and its members.

Whether or not that particular danger comes to pass, the actions of the state executive board described above clearly pose an immediate threat to the financial integrity of the local, and violate the democratic rights of the members of UPW.

I find that the actions described above (1) threaten the dissipation or loss of the funds and/or assets of the local; and (2) establish that the local is acting in violation of the AFSCME Constitution (as well as the UPW Constitution) and my November 21, 2002 order suspending Mr. Rodrigues. Therefore, in my opinion, an emergency situation exists in United Public Workers, Local 646, AFSCME, AFL-CIO, which requires that UPW be placed under administratorship immediately, pending notice and hearing. Therefore, in accordance with Article IX, Section 36 of the International Constitution, I have placed UPW under administratorship, pending notice and hearing, effective immediately. I have appointed Peter Trask to serve as the administrator of UPW with the full authority provided in Article IX, Section 44 of the International Constitution. I have also appointed AFSCME Area Field Services Director, Liz Ho, to serve as the deputy administrator of UPW.

You are directed to turn over to Administrator Trask all books, records, funds and other property of the local that are in your possession, custody or control. In accordance with Article IX, Section 44 of the

3

International Constitution, I am ordering the immediate suspension of all state officers and executive board members of UPW. You are still bonded.

The chairperson of the Judicial Panel has been notified of my action and a hearing before the Panel on the propriety of this administratorship will be held within twenty-one days as required by the International Constitution."

The case was assigned to Judicial Panel Chairperson John Seferian to serve as the administratorship hearing board. Following due notice to all parties, a hearing was held on December 18, 2002 in Honolulu, Hawaii. All testimony was given under oath and a transcript was made by a professional court reporter.

Larry Weinberg, General Counsel for the International Union, represented the International President.

## DISCUSSION AND FINDINGS

On November 19, 2002, Gary Rodrigues, the state director of the United Public Workers (UPW), was found guilty of 101 counts of embezzlement of UPW's assets, acceptance of kick-backs, mail fraud, money laundering, money laundering conspiracy, and scheme to defraud a health care benefit program. The charges involved misappropriation of hundreds of thousands of dollars of the dues and benefit fund money of UPW members. Following the verdict, Gary Rodrigues stated that his attorneys had advised him that he had a legal right to continue as state director until he was formally sentenced and that he intended to do so. His sentencing was scheduled for May 12, 2003, but has been postponed twice and is now set for September 29, 2003.

4

George Yasumoto, the state president of UPW, informed members of UPW's executive board that he was calling a special meeting of the board for 10:00 a.m. on November 22, 2002 for the purpose of suspending Gary Rodrigues from office on the basis of the jury verdict. Almost immediately after George Yasumoto gave notice of his intention to call a special executive board meeting, Gary Rodrigues notified the board, through his deputy, Dwight Takeno, that he was calling a special meeting of the board for that same day, to begin one hour earlier at 9:00 am. His purpose in calling the special meeting of the executive board was to have the board confirm his continuation in office pending sentencing.

When International President McEntee learned of these developments at UPW, he immediately acted to suspend Gary Rodrigues from the position of state director of UPW pursuant to Article V, Section 13 of the International Constitution. (IP 6) The letter notifying Gary Rodrigues of his suspension was faxed to him at UPW headquarters at approximately noon, local time, on November 21, 2002. Upon learning of the suspension of Gary Rodrigues, George Yasumoto decided to cancel the special executive board meeting that had been called for the next day and began contacting members of the executive board to tell them of his action. He attempted to advise the board members of the cancellation of the meeting by telephone and at informal meetings with other board members on November 21. In addition, on the morning of November 22, he put out a written memo giving notice of the cancellation of the meeting which was given to the executive board members as they arrived at UPW's building prior to the time of the meeting. (IP 1) That memo specifically referred to

5

President McEntee's November 21 letter suspending Gary Rodrigues and advised the board members that the meeting would be scheduled within 30 days.

Earlier on the morning of November 22, Brother Yasumoto learned that UPW's staff was countermanding his cancellation of the November 22 meeting, including Dwight Takeno, at the direction of Gary Rodrigues. Yasumoto contacted the International Union to ask whether he had the authority to cancel the special executive board meeting. President McEntee responded in a letter faxed prior to the scheduled start of the special meeting in which he advised Brother Yasumoto that he had the authority to cancel the meeting. (IP 2)

As members of the executive board arrived at UPW's building that morning, Brother Yasumoto advised them that he had cancelled the meeting and gave them a copy of his memo to that effect. However, UPW staff were also outside the building and were telling the board members that the meeting was not cancelled. At about 8:30 am, Gary Rodrigues came out of the UPW building and told the board members standing outside to come into the building for the meeting. Rodrigues then took a number of the board members into the building with him.

Shortly before 9:00, Yasumoto entered the building and went to the room where the meeting was to be held. Gary Rodrigues and a number of UPW staff were in the meeting room when he arrived. There were also three private attorneys present, one of whom was the local's regular attorney. The other two had been retained by Gary Rodrigues to represent the local in connection with the criminal investigation that led to his indictment and the guilty verdict. Yasumoto began by telling the board members

6

that the meeting was cancelled and distributed a copy of the letter he had received from President McEntee confirming his authority to cancel the meeting. Gary Rodrigues indicated his disagreement with Brother Yasumoto's cancellation of the meeting by word and gesture. Everyone present remained in the meeting room.

Brother Yasumoto then told the executive board members and the others present in the room that he wanted to have an executive session and he asked everyone but the board members to leave the room. Gary Rodrigues, who was sitting directly across the room from Brother Yasumoto, "shook his head and said no. And no one moved." (TR 24). The board then discussed having an "informal informational meeting." Brother Yasumoto again asked everyone except the board members to leave the room. The other members and staff present complied this time, but the attorneys remained in the room. After some board members stated that they wanted the attorneys to stay during the informal informational meeting, the meeting went forward with them in the room. The informational meeting continued from 10:20 until approximately 11:15. At some point, the board began discussing going into a formal meeting despite the fact that Brother Yasumoto had cancelled the meeting. When it became clear to him that the board intended to go into a formal session, Brother Yasumoto advised the board members that they could not do that because he had cancelled the meeting and then left the meeting.

After Brother Yasumoto left the meeting, the executive board, on the advice of the attorneys, decided that it should adopt a new agenda for the meeting in light of the suspension of Gary Rodrigues by President McEntee and the absence of Brother Yasumoto. The proposed new agenda consisted of four items: the suspension of the

7

Gary Rodrigues by the International President; the suspension of George Yasumoto as state president; the appointment of an interim state president; and the appointment of an interim state director.

During the informational meeting, the attorneys advised the executive board that, in order to have a formal meeting and select an interim state director, it would be necessary to suspend George Yasumoto as state president and appoint an interim replacement. They gave this advice because, under UPW's constitution, it is only the state president who has the authority to convene the executive board in a formal meeting and to make an appointment to fill a vacancy in the position of state director, subject to the approval of the executive board.

At approximately 11:15 am, the executive board ended its informational meeting and invited the staff and others who had been excluded from the meeting to return. The meeting was called to order by Carol Noland, the state secretary-treasurer of UPW, who was presiding in place of George Yasumoto. The first action taken by the board was to adopt the revised agenda referred to above. Once that was done, Gary Rodrigues was invited to address the board regarding the first item on the agenda, his suspension.

Gary Rodrigues spoke for about 30 minutes. In the course of his statement, he addressed several issues, but focused primarily on his suspension from office, his intention to serve until his sentencing had he not been suspended, and his desire to have the board select Dwight Takeno as his successor. According to Liz Ho, Gary Rodrigues "informed the board that he was disappointed that AFSCME had suspended him because he had met with his attorneys and they had informed him that he could

8

continue as state director until he was sentenced." (TR 27) Sister Ho testified that Gary Rodrigues pressed the board to select his deputy, Dwight Takeno as his successor in very strong terms. He stated that "he would work toward a smooth transition with Mr. Takeno, however, if Mr. Nakanelua was selected to be the interim state director that he was out of there." (TR 28)

Under Article 8, Section 3(a) of UPW's constitution, the state president is the officer of the local who presides over meetings of the executive board. The UPW constitution also provides that a vacancy in the office of state director "shall be filled by appointment by the state president for the period remaining until the next regular election at the Convention with the approval of the state executive board." (Article 16, Section 3) Sister Ho testified that Fred Altshuler, one of the private attorneys retained by Gary Rodrigues, advised the board that Brother Yasumoto should be suspended because he had left the board meeting and because he was unwilling to appoint Dwight Takeno to replace Gary Rodrigues and it was necessary to have someone serving as president who was willing to make that appointment. (TR 28-29) Following Altshuler's advice, the board voted to suspend George Yasumoto and to appoint state secretary-treasurer Carol Noland to serve as interim or acting president. Sister Noland then appointed Dwight Takeno to serve as state director and the board approved that appointment. Having completed the items in the revised agenda, the board then adjourned.

Peter Trask testified that, only a few days after he was appointed by President McEntee to serve as Administrator of UPW, he received a letter from the attorney who

had represented Gary Rodrigues in his criminal trial demanding that the local make payment to Rodrigues for accumulated vacation and sick leave he claimed to be owed to him by the local. His letter stated that the "total vacation leave accumulated is nine hundred and seventy five and one-half (975.50) hours and the total sick leave accumulated is five thousand nine hundred fifty two (5952) hours." His letter went on to state that payment was to be made at "the basic rate of pay on the date that Mr. Rodrigues ended his employment." (IP 7)

Tom Kulikosky, auditing manager for the International Union, testified that the total number of hours of vacation and sick leave for which Rodrigues sought payment in his attorney's December 9 letter was 6,927, which, assuming a 40 hour work week, would equate to three and one-third years of work. He calculated that, based on the salary Rodrigues was receiving on his last day of work, the cost to the local of making the payment requested would have been $666,079, not including related pension costs and payroll taxes, which would significantly increase that amount. (TR 38)

Kulikosky also testified that he had serious doubts about the amounts of hours claimed for both sick leave and vacation. He had been part of a team of auditors from the International Union assigned to review the finances of UPW in December 1999. Their review resulted in the issuance of a report entitled "Hawaii Local 646, Preliminary Report Findings, February 1, 2000," which addressed a number of issues, including the manner in which the local accrued leave for its officers and staff and the reliability of the leave records and the accruals shown on the books, particularly those of for Gary

Rodrigues. (IP 8) Kulikosky testified that there were a number of serious questions in all of these areas.

According to Kulikosky's testimony and the audit report, at least until 1999, Rodrigues had complete control of the processes for authorizing the taking of leave, authorizing payment in lieu of leave, and the recording of leave accruals and usage.

He testified that, until 1995, the local's vacation policy limited accruals to 90 days, so that an employee would not be able to carry-over more than 90 days (720 hours) of unused vacation from one year to the next. In 1995, Gary Rodrigues, acting unilaterally and without the approval of the executive board, revised that policy to allow unlimited accrual and carry-over of vacation. When that change was made, Rodrigues, who had control of the local's leave records, immediately credited himself with 1036 hours, or 129.5 days, in addition to the 90-day accrual permitted at the time of the change.

The leave records maintained under Rodrigues' direction also reflected that no vacation was recorded as taken by Rodrigues during the years, 1994, 1995, 1996, 1997, 1998 and 1999, despite the fact that the local's records showed that he had taken vacation during almost every previous year, when accruals were capped at 90 days, back to 1965. According to the sick leave records maintained under Rodrigues' direction, he took no sick leave during any of the years from 1985 through 1999.

Kulikosky testified that Rodrigues received a cash payment in lieu of taking 1000 hours of vacation in January 1999. The total amount of the payment was $51,210, and the payment was made without the approval of any UPW official other than Rodrigues.

11

At that time, UPW had no policy authorizing cash payments in lieu of vacation, even if the payment had been properly approved. According to the audit report, the financial condition of UPW at the time was extremely precarious and was made significantly worse by the payment to Rodrigues.

On October 4, 2002, the day before his criminal trial began, Rodrigues received another cash payment in lieu of vacation. This time the payment was for 935 hours and the total amount was $89,900. (The 2002 payment was almost double the amount of the 1999 payment, even though the number of hours cashed in was less, because the executive board had voted to roughly double Rodrigues' salary shortly before, and in anticipation of, his indictment). Following the 1999 audit report, UPW had amended it's personnel policies to provide for payment in lieu of vacation for employees whose request for vacation was denied by the Union, or, in "the case of the State Director as determined by the State President and the State Secretary Treasurer that the State Director's absence is not in the best interest of the UPW." However, the form signed by the president and secretary-treasurer did not indicate that the officers signing had made the required determination that Rodrigues' absence would not be in the best interest of UPW, but rather, that the request for vacation had been "Denied." (IP 9) There was no evidence that Rodrigues had requested vacation or that his request had been denied and, beginning the next day, he began an extended use of his vacation time so his salary would continue while he spent his days in court during the weeks of his criminal trial.

As stated in President McEntee's letter imposing this administratorship, the primary reasons were: (1) Gary Rodrigues' continued involvement in, and influence

12

over, the affairs of UPW after he was found guilty of more than 100 crimes against the union and its members and despite the fact that he had been suspended from office by President McEntee; (2) constitutional violations committed by UPW in the course of the November 22 meeting of the board; and (3) the threat that the funds of UPW would be further dissipated as a result, as well as by the payment of Rodrigues' claims for almost $700,000 in vacation and sick leave. Ample evidence was presented to support all of these reasons.

Based on his actions and his statements to the UPW executive board on November 22, it is clear that Gary Rodrigues intended to continue serving as state director of UPW until he is sentenced for his crimes against the union and would have done so had he not been suspended by President McEntee. Given the fact that the executive board bowed to his wishes on every decision it made leading up to and during the meeting on November 22, it seems likely that they would have permitted Rodrigues to remain in office pending his sentencing.

When George Yasumoto attempted to cancel the meeting that had been called for November 22 after Rodrigues was suspended, his action was countermanded by calls made to the executive board members at the direction of Rodrigues, and virtually every executive board member heeded those calls and came to the board meeting. When Brother Yasumoto stood outside the UPW building on the morning of November 22 advising board members that he had cancelled the meeting and attempting to persuade them not to go in, Rodrigues came out of the building, told the board members present to come in to the meeting and they followed him inside.

13

Once the board members were inside the meeting, Brother Yasumoto again advised the board members that he had cancelled the meeting and gave them a copy of the letter he had received from President McEntee confirming his authority to do so. Gary Rodrigues indicated his disagreement with Yasumoto's cancellation of the meeting, and all of the board members remained in the room. Yasumoto then attempted to call for an executive session, but Rodrigues again indicated his disagreement and, again, no one left the room.

When the board reconvened following the informational meeting, Gary Rodrigues made it abundantly clear that he wanted the board to select Dwight Takeno as state director and that he would work closely with Takeno to ensure a smooth transition. In contrast to what would happen if the board chose Takeno, he advised the board that he would have nothing further to do with the union if the board selected Dayton Nakanelua as state director. Once again following his lead, the board selected Takeno, thereby ensuring not only that the union would be led by Rodrigues' chosen successor, but also that Rodrigues would continue to be involved in the union's affairs at the highest level. These facts clearly establish Rodrigues' continuing influence and control over UPW and its executive board, despite his conviction and suspension, and that his influence would have continued even after the board selected a successor on November 22 if the local had not been placed under administratorship by President McEntee.

When Brother Yasumoto left after the informal informational meeting, the board suspended him under Article IX, Section 47 of the International Constitution. While

14

several reasons were given for that action, it seems clear that the real reason was that he would not appoint Dwight Takeno as the new State Director of UPW. Article 16, Section 2 of the UPW constitution provides that vacancies in the position of State Director "shall be filled by appointment by the State President for the period remaining until the next regular election at the Convention with the approval of the State Executive Board."

Under this language, selection of a new state director could only take place if the president and a majority of the board agreed on a candidate. The president could not appoint without the approval of the board and the board could not approve someone that had not been appointed by the president. As long as Brother Yasumoto held the position of president and was unwilling to appoint Dwight Takeno, he could not be selected to fill the vacant state director position. Therefore, the board suspended Yasumoto so they could replace him with someone who would appoint Takeno. This was clearly not a permissible basis for suspending an officer under the " imminently dangerous" conduct standard required by the International Constitution. That violation is compounded by the fact that the purpose of the suspension —avoiding the constitutional procedure for filling a vacancy—was itself a violation of the UPW constitution.

The conduct of Rodrigues which led to his conviction on more than 100 counts relating to misappropriation of the funds of UPW and it's benefit funds had been going on for some ten years at the time of his conviction. Had he been allowed to continue in office pending his sentencing, there is every reason to believe that it would have continued until the day he left office. Even after Rodrigues had been suspended by

15

President McEntee, the dissipation of funds threatened to continue because it is likely that UPW would have paid him the hundreds of thousands of dollars he was demanding as payment for what he claimed to be his accrued vacation and sick leave.

As noted earlier, Rodrigues, through a letter from his attorney in early December 2002, demanded that he be paid for 6,927 hours of leave (975.5 hours of vacation and 5952 hours of sick leave), which would cost UPW $666,079, not including related pension costs and payroll taxes, both of which would be substantial. Based on the pattern of previous payments to Rodrigues of cash in lieu of vacation, the board's decision to roughly double his salary to $200,000 shortly before his indictment, and the failure o n the part of the executive board members and officers to challenge any of his actions, there is little doubt that he would have received that payment on demand had the administratorship not been imposed. Moreover, according to Tom Kulikosky's testimony, such a payment would be, at best, a questionable expenditure of UPW's funds in light of the serious questions that exist regarding the accuracy of Rodrigues' leave records and his legal entitlement to those payments.

Prior to the administratorship, Rodrigues had already received two payments of cash in lieu of vacation of $51,210 in January 1999 and $89,900 in October 2002. The first payment was made on the sole authorization of Rodrigues without support from any personnel policy and was not challenged by any officer or executive board member of UPW even after its legality was questioned by the International Union's audit report. By the time of the second payment, UPW had adopted a new personnel policy permitting payment of cash in lieu of vacation to the state director, with the approval of the state

16

president and secretary-treasurer, under certain limited circumstances. The president and secretary-treasurer of UPW approved the second payment even though the form they signed to authorize the payment did not contain the required finding that those circumstances existed.

At the beginning of 2001, Rodrigues' salary was $113,000. At that time, Rodrigues had been under investigation by the federal government for several years and it was widely known and publicly reported that he was about to be indicted for offenses related to his misuse of the funds of UPW and several insurance programs that provided benefits to members of the local. Knowing that Rodrigues was about to be indicted, the executive board inexplicably voted, apparently without objection, to increase his salary from $113,000 to $200,000. To make matters worse, the minutes of the meeting approving the increase reflect that this increase was only the first of several "stages" to bring Rodrigues' salary to an "equitable" level for the position. The minutes further reflect the board's understanding of the true value of the position and that the increase being approved was for the personal enrichment of Rodrigues in that the same motion that approved his increase stated that the "salary of the future State Director shall be $113,000." The board adopted that motion on January 20, 2001, and Rodrigues was indicted only six weeks later on March 7. Aside from the immediate cost to the local for the increased salary, the effect of the motion was to almost double the amount of Rodrigues' claim against the local for accrued vacation and sick leave.

17

As noted earlier, even assuming everything else about Rodrigues' claim for vacation and sick leave was proper, there are serious questions about the validity and reliability of the underlying accruals.

First, until 1995, the local had capped vacation accruals at 90 days. In 1995, Rodrigues, acting unilaterally and without board approval, changed the policy to unlimited accrual. At the time that change was made, he credited himself with 219.5 days, 129.5 more than he could have carried-over under the pre-existing policy.

Second, at least until 2000, Rodrigues was responsible for approving and recording his own leave. The audit conducted by the International Union in December 1999 found that no vacation was recorded as taken by Rodrigues from 1994 on, even though he had taken (and recorded) vacation in almost every prior year of his employment with UPW back to 1965. The sick leave records maintained under Rodrigues' direction reflected that he took no sick leave for the years 1985 through 1999. While it is possible that these records accurately reflect the leave taken by Rodrigues during these periods, given his absolute control over the leave records and his now proven propensity for bending the rules for personal advantage, it would be difficult to justify accepting his claims at face value.

Third, even if all of the other legal and factual issues regarding these claims were resolved, there would still be a question as to whether Rodrigues was entitled to any payment for his accrued sick leave. Under UPW's personnel policies, accrued sick leave is only payable to employees who have left UPW's employ by retirement. Employees who leave UPW for any other reason have no right to any payment for accrued sick

18

leave. When Rodrigues announced his intention to retire at the meeting on November 22, President McEntee had already suspended him under a provision that contemplates the filing of charges and the continuation of the suspension pending the resolution of those charges. Dayton Nakanelua in fact, filed such charges on November 19. Therefore, prior to his announced retirement, Rodrigues had been suspended pending possible termination. As a result, his right to any payment for accrued sick leave is subject to question.

Based on the evidence presented, it is clear that loss or dissipation of the funds of UPW had occurred and threatened to continue and the local was acting in violation of the International Constitution. Therefore, the International President has demonstrated the existence of the grounds he asserted as the basis for placing UPW under administratorship.

## DECISION

It is the decision of the administratorship hearing board that International President McEntee acted appropriately in imposing an administratorship over UPW Local 646.

June 4, 2003
Washington, D.C.

John Seferian
Judicial Panel Chairperson
AFSCME, AFL-CIO